1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FRANK RAYMONDE,

              Plaintiff,

  v.

MIRANT CALIFORNIA, LLC, and
DOES 1 through 20, inclusive,

              Defendants.

_____/

No. C 08-03733 WHA

**ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

**INTRODUCTION**

      In this highly charged retaliatory wrongful termination action between a power plant employee and his employer, defendant Mirant California, LLC moves for summary judgment against plaintiff and former employee Frank Raymonde. For the reasons stated below, summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

**STATEMENT**

      Depending upon who is asked, plaintiff Frank Raymonde is either a disgruntled employee who was justly reprimanded and fired for intimidating his coworkers and failing to follow instructions, or a safety-conscious worker who — after being nearly electrocuted on the job — was harassed and unlawfully retaliated against for properly reporting dangerous workplace conditions to company and government officials.

      The following facts — unless expressly noted otherwise — are not disputed by the parties.

### 1. THE HIRING OF FRANK RAYMONDE

On or about June 11, 2001, plaintiff Frank Raymonde began employment as a power plant technician at the Pittsburg Power Plant, a facility owned and operated by defendant Mirant in Pittsburg, California (Battles Decl. ¶ 2; Raymonde Decl. ¶ 3). Plaintiff's specific title at Mirant — at least at the time he was terminated — was Assistant Control Operator (Raymonde Decl. ¶ 3). All power plant technicians employed at this facility, including plaintiff, were represented exclusively by the International Brotherhood of Electrical Workers (IBEW), Local Union No. 1245, with the terms and conditions of their employment governed by a collective-bargaining agreement (CBA) between Mirant and the union (Battles Decl. ¶ 3; Raymonde Decl. ¶¶ 2, 6).

### 2. THE SAFETY INCIDENT ON FEBRUARY 5, 2007

At the heart of plaintiff's claims is a safety incident a few months prior to his termination. Defendant does *not* dispute that this incident occurred or that plaintiff took various lawful and proper actions in its wake (Greaves Decl. ¶¶ 16–26). Rather, defendant simply denies that these events played any role in the adverse actions later taken against plaintiff (*ibid.*).

The safety incident, as described by both plaintiff and former Mirant co-worker Gregory Ho, unfolded as follows: On February 5, 2007, plaintiff was given the task of making the power plant's service air compressor available after it was taken down for maintenance (Ho Dep. 53:4–19). This task required plaintiff to service a circuit breaker for the air compressor. Normally, the person performing this task would be the one to "energize" the compressor after its completion (*id.* 55:15–56:5). Instead, the air compressor was brought back into service — or "energized" — by Mirant employee Joe Moffat while plaintiff was still working on the breaker (*ibid.*; Greaves Decl. ¶ 24; Raymonde Decl. ¶ 4). Plaintiff was uninjured. Both parties, however, acknowledge that this incident could have resulted in plaintiff's electrocution (Ho Dep. 55:12–17; Greaves Decl. ¶ 24; Raymonde Decl. ¶ 4)

Plaintiff followed proper company procedure when he reported the "near miss" incident to his superiors thereafter (Greaves Decl. ¶ 24). Plaintiff, however, asserts that after properly reporting the incident and asking his superiors to initiate a "Near Miss Incident Report," plant manager Bill Greaves improperly assigned the task of writing the report to Joe Moffat, the very

employee whose conduct violated company procedures (Raymonde Decl. ¶ 4). According to

plaintiff, this was a clear conflict of interest. Greaves does not dispute that he directed Moffat to

write up the "near miss" report describing the circumstances of the incident (Greaves Exh. 10).

After reviewing the report, however, Greaves concluded that Moffat's description of the incident

was entirely consistent with plaintiff's initial report, and therefore no further investigation was

necessary (Greaves Decl. ¶ 24). Greaves then disciplined Moffat for violating company

procedures, which was put in writing and is now part of the record (Greaves Exh. 11).

Shortly after reporting the safety incident, plaintiff alleges that he began to receive

numerous false allegations made against him regarding his job performance, and was constantly

harassed for having reported the safety incident (Raymonde Decl. ¶¶ 7, 8, 13–15). To support

this claim, plaintiff offers the deposition testimony of Mirant employee Trent Wood, who worked

alongside plaintiff and acknowledged that plaintiff "took a lot of heat" from non-management

personnel for reporting the safety violation (Wood Dep. 24:12–25:22; 33:17–20):

> Q.  What do you mean when you say "Frank took a lot of heat
>      because he complained"?
>
> A.  Just everyone saying we're wrong and just the general
>      dislike. Operations was really getting some just, you know,
>      bad talk.
>
> *          *          *
>
> Q.  Why did they feel Frank was wrong for complaining about
>      the safety?
>
> A.  Well, when the incident happen[ed], they th[ought] Frank
>      was lying or blowing it out of proportion, is what I — my
>      take on it. I believe he was in doing some switching, and
>      the guy turned the machine on. He's not supposed to touch
>      it. It does put Frank in jeopardy. And he has a right to be
>      mad. But frankly, it's not popular to do that. They get
>      angry. If you follow procedure — you have to be careful.
>      And you know, I think they took it personally. It was a
>      hard time.

Plaintiff further alleges that Kirk Davis, a union steward for IBEW Local 1245 at Mirant, shouted

at plaintiff's co-worker Gregory Ho (in plaintiff's presence) soon after the incident was reported,

saying that it was wrong to have reported a maintenance supervisor, and how sorry the crew was

going to be for having reported such a thing (Raymonde Decl. ¶ 14). Ho's deposition on this

verbal exchange corroborates at least the fact that Davis told him that the safety incident "should have been handled differently," and that Davis reiterated this opinion on numerous occasions to various Mirant employees following the February 5 safety incident (Ho Dep. 78:24–79:10; 85:20–87:9). Like employee Wood, Davis was not a member of Mirant management (*id.* 105:10–23).

Plaintiff then lodged additional complaints regarding the February 5 safety incident and the alleged acts of harassment described above, including (Raymonde Decl. ¶¶ 5, 6; Exh. 1):

1. A letter sent on February 22, 2007, to his union complaining of instances of "railroading" and "black-listing" (occurring *prior to* the safety incident), as well as acts of retaliation by officers of the union stemming over the February 5 safety incident. This letter was also sent to the Chief Executive Officer of Mirant.

2. A letter sent on March 25, 2007, to the National Labor Relations Board, inquiring whether and how a complaint against the union could be registered. The NLRB responded to plaintiff's letter with a "Complaint Against a Labor Organization" form, which plaintiff filed on April 9, 2007.

Defendant denies that these complaints played any role in the adverse employment actions targeted by plaintiff in this litigation (Greaves Decl. ¶¶ 16–26).

### 3.   THE ALTERCATION ON MAY 3, 2007

Just as defendant does not dispute the facts surrounding the safety incident on February 5, 2007, plaintiff does not dispute any material facts surrounding the following altercation that occurred at the Pittsburg Power Plant (Raymonde Dep. Exh. 21).

On the morning of May 3, 2007, plaintiff reported to work for the last day of his 21-day shift cycle (Raymonde Decl. ¶ 30; Raymonde Dep. Exh. 29 ("NLRB Affidavit") at 2:16–17).[1] Scheduled for that day was a "5 Unit Reliability and Turbine" valve testing (Greaves Decl. Exh. 3). While plaintiff was initially scheduled to act as the Control Operator for this test, another

[1] The 21-day shift cycle is followed by a week of downtime during which an employee is not scheduled to report to work. Since May 3 was the last day of plaintiff's shift cycle, his next scheduled day of work was not until May 11, 2007 (Raymonde. Decl. ¶ 30).

1    Mirant employee, John Nelson, was informed that morning that he would be replacing plaintiff

2    for that day's testing and training (*id.* Exh. 2).[2]

3         After plaintiff arrived in the plant's control room, Nelson instructed plaintiff to check the

4    5 Unit's fan equipment as part of this test, saying "we want to get this done as soon as possible so

5    let's get this show on the road" in what plaintiff alleged was a "very arrogant" manner (NLRB

6    Affidavit at 2:21–3:2).  Plaintiff then replied to Nelson, "listen you prissy cunt, you're a trainee

7    here just like me, [Gregory] Ho is the CO and I work for him, don't start giving me orders"

8    (Raymonde Dep. 151:2–9; NLRB Affidavit at 3:1–2; Ho Dep. 36:21–37:5).  Thereafter, Gregory

9    Ho — who was present during this exchange — ordered plaintiff to check the 5 Unit's fan

10   equipment (Ho Dep. 32:16–24).  Upon his return from performing this task, plaintiff again

11   confronted Nelson, saying that they "made the same money" and "he was not going to take orders

12   from [Nelson]" (Greaves Decl. Exhs. 2, 3).  Plaintiff was apparently within inches of Nelson's

13   face when making both statements.  This altercation was then reported to supervisor Kevin

14   Devoid, who informed *his* supervisor Alan Johnson about what transpired (*ibid.*).

15        Supervisor Johnson confronted plaintiff about the altercation later that same day.  In

16   plaintiff's own words, Johnson asked him, "Frank, is there a problem?"  Plaintiff responded, "Not

17   that I know of."  Johnson then said "[Nelson] says you cursed him."  After plaintiff did not

18   respond, Johnson told plaintiff, "I'll dismiss you right now for insubordination."  Plaintiff then

19   replied, "I stated my position [to Nelson] forcefully."  After being warned that Mirant employees

20   should treat each other with civility, plaintiff then complained that he could "feel [his] ulcers

21   acting up", and proceeded to leave work sick.  Johnson instructed plaintiff to "don't come back to

22   work without a note from a doctor" (NLRB Affidavit at 3:3–4:5).

23        After plaintiff's departure from work, supervisor Johnson met with plant manager Greaves

24   to debrief him on the incident that had occurred that morning between plaintiff and Nelson

25   (Greaves Decl. ¶ 2, Exh. 1).  Greaves also met directly with Nelson and human resources manager

26

27        [2]  The Control Operator position was held, at the time this incident occurred, by Mirant employee
     Gregory Ho (Raymonde Dep. 118:12–119:18).  Plaintiff and Nelson normally took orders from the Control
28   Operator but were given the opportunity for training purposes to perform the role of Control Operator on certain
     days.

Lisa Battles, as well as employees Ho and Wood, and union steward Davis. During these meetings, Greaves was informed about prior incidents where plaintiff lost his temper at work, threatened other employees with physical harm, and boasted about physical harm he had done to other people (*ibid.*). Ho and Wood also drafted email statements regarding past examples of plaintiff's aggressive behavior (Battles Decl. Exh. 2).

Based upon this information, Greaves concluded that something needed to be done with plaintiff's behavior at the plant, and that plaintiff might need to attend anger management training through Mirant's Employee Assistance Program (Greaves Decl. ¶ 2). For security purposes, Greaves then decided to temporarily deactivate plaintiff's security badge, and informed plant employees via email not to allow plaintiff into the plant until instructed otherwise (*id.* ¶ 3, Exhs. 4, 5). At this time, defendant asserts that it did *not* intend to terminate plaintiff's employment (*id.* ¶ 2). Greaves then instructed supervisor Johnson to draft a letter to Raymonde, thereby setting in motion the events leading to plaintiff's firing two weeks later (*id.* ¶ 4, Exh. 6).

**4.    THE LETTERS LEADING UP TO PLAINTIFF'S TERMINATION**

Two separate letters from supervisor Johnson were mailed to plaintiff regarding the deactivation of plaintiff's security badge. The *first* letter, dated and mailed on May 4, 2007, set forth the following (Greaves Decl. ¶ 4, Exh. 6; Raymonde Decl. Exh. 7):

> Frank,
>
> As a result of the incident which occurred on Thursday, May 3, 2007, you will not return to Pittsburg Power Plant, nor attempt to access any of Mirant's other facilities until further notice. . . . [Y]ou will remain at home, and available, until a Mirant management person has given you permission to return. Your security badge is no longer valid.
>
> We will be contacting the Employee Assistance Program and will be seeking further guidance from them on this incident. I suggest that you also contact the Employee Assistance Program at [phone number].
>
> Your job assignment is to take medical care of yourself and to be available when we call you. We also need an updated phone number where you can be reached. The number you give us will be the one we use for further communications regarding this matter.
>
> . . .

> We expect to hear from you in a reasonable time period with an
> updated contact number.

The letter, signed by supervisor Johnson, included Johnson's office and mobile phone numbers.

Plaintiff asserts that he did *not* receive the letter mailed on May 4. Rather, the first time plaintiff saw proof of its existence was when it was produced to plaintiff's attorney by the State of California Department of Industrial Relations around June 2008 (Raymonde Decl. ¶¶ 48, 65). Because of this missed connection, on May 11, 2007, plaintiff arrived at the Pittsburg Power Plant to perform his regularly scheduled shift. Upon arrival, he discovered that his security access card — which is required to enter the facility — had been disabled (Greaves Decl. ¶ 3; Raymonde Decl. ¶ 40). At the gates of the plant, plaintiff immediately called the control room to inquire about this denial of access. The control room informed plaintiff that, on instructions from management, he was not to be allowed entry onto the premises (Greaves Decl. Exhs. 4–5; Battles Decl. Exh. 2; Raymonde Decl. ¶ 41). Two days later, plaintiff filed a letter to the United States Department of Labor, Occupational Safety and Health Administration (OSHA), complaining of retaliation over a safety issue (Raymonde Decl. ¶¶ 5, 6; Exh. 1).[3]

Having received no communications from plaintiff, defendant mailed a *second* letter to plaintiff, dated May 10, 2007 (Greaves Decl. Exh. 7; Raymonde Decl. Exh 16):

> Frank,
>
> Last week I sent you a letter dated May 4, 2007 that outlined your current work status. In that letter I instructed you to contact me immediately with a proper phone number so I can reach you. I have not heard from you since you left work on May 3, 2007.
>
> I was informed by the crew that they believed you had resigned your job, based on your comments when you were leaving work last Thursday. Therefore, if I don't hear from you by May 17, 2007, we'll consider this your resignation.
>
> I'm sending two copies of this letter via different delivery methods to ensure you receive it.

---

[3] Plaintiff was notified by OSHA on June 13, 2007, that the complaint was being transferred to California Division of Labor Standards Enforcement.

The letter was again signed by supervisor Johnson. While defendant allegedly mailed this letter via Federal Express and certified mail on May 10, plaintiff says he did not receive the letter until May 17, 2007, the deadline date set forth in the letter (Greaves Decl. ¶ 5; Raymonde Decl. ¶ 48).

According to plaintiff, the problem with the delivery of both pre-termination letters was due to the letters being "sent to an incorrect address" (Raymonde Decl. ¶ 48). Indeed, both the May 4 and May 10 letters indicated a mailing address on North Civic Drive in Walnut Creek, California (Raymonde Decl. Exhs. 16, 17). It is undisputed that this was not plaintiff's actual address at the time the pre-termination letters were mailed. Defendant, however, provides an explanation for this error: the mailing address used on the May 4 and May 10 letters was simply plaintiff's "current" home address in Mirant's intranet database at the time the letters were mailed (Battles Decl. ¶ 9).

This is a disputed fact. Contrary to defendant's explanation, plaintiff claims that Mirant's intranet database *did* contain his correct mailing address at the time the pre-termination letters were mailed (Raymonde Decl. ¶ 56). To support this assertion, plaintiff provides a computer screenshot from Mirant's intranet database showing his current address information with an "effective date" of December 1, 2006, corresponding to the date that he moved to his current address (*id*. Exh. 3). Additionally, plaintiff has produced a "Statement of Benefits" mailed by defendant to plaintiff's correct home address on March 16, 2007 (Raymonde Decl. ¶ 51, Exhs. 6). This is definitive proof, according to plaintiff, that defendant *did* have his correct address at the time the pre-termination letters were mailed.

After receiving the May 10 letter on May 17, plaintiff immediately called Mirant's corporate human resources director, Cathy Brennan, to inquire about the circumstances behind plaintiff's May 11 denial of access to the Pittsburg Power Plant (*id*. ¶ 49). After a brief discussion, Ms. Brennan — who was located in Mirant's Atlanta offices — transferred the call to Lisa Battles, human resources manager for Mirant's operation in Pittsburg. Some of what was said in these two phone conversations is disputed. What is important, however, is that plaintiff admits that Ms. Battles advised him to "call [supervisor Alan] Johnson or [plant manager Bill] Greaves and work it out with them" and "under no circumstances will [plaintiff] be allowed to

return to work without getting some kind of anger management training" (Raymonde Dep. 160:25–161:12; Raymonde Decl. ¶ 36; Battles Decl. ¶ 6). During this conversation, Ms. Battles also obtained plaintiff's correct address and phone number, which was later used to send plaintiff's May 25 termination letter (Raymonde Decl. ¶ 49; Battles Decl. ¶ 9).

The very next day, plaintiff went to the law offices of Mr. Daniel Ray Bacon and retained him as counsel (Raymonde Decl. ¶ 50). According to plaintiff, after reading the May 10 pre-termination letter, his attorney attempted to call supervisor Johnson (with plaintiff at his side) so that plaintiff could discuss the situation. Attempts to reach supervisor Johnson via phone on May 18, 2007, were unsuccessful, and Attorney Bacon left a voice message with a call-back number indicating that plaintiff Raymonde was calling as requested (*ibid.*).[4] Attorney Bacon then mailed and faxed a letter to both Mirant's Atlanta offices and the Pittsburg Power Plant, dated May 18, 2007, stating that plaintiff had *not* resigned his job and had no knowledge of why he was "locked out" of his job. The letter also requested copies of the May 4 letter that plaintiff had not received, and inquired as to "when Mr. Raymonde [would] be permitted to return to his job."

Defendant acknowledges receiving this letter from plaintiff's attorney (Battles Decl. ¶ 10; Greaves Decl. ¶ 8). Neither plant manager Greaves nor supervisor Johnson, however, responded to the letter or attempted to contact Attorney Bacon, since they believed — based upon Battles' alleged instructions to plaintiff during their May 17 phone conversation and the contents of the two pre-termination letters — that it had been made clear to plaintiff that he was to "call [Bill Greaves] or Alan Johnson *personally*," and that Mr. Bacon's letter and phone call did not comply with this instruction (Greaves Decl. ¶¶ 7, 8). Defendant does claim, however, that supervisor Johnson tried to call plaintiff *twice* during the week of May 21 using the supposedly current phone number plaintiff provided to Ms. Battles during their May 17 conversation (Greaves Decl. ¶ 9).[5] No answer or answering machine was received.

---

[4] Attorney Bacon submitted a declaration corroborating these facts. Defendant moved to strike Bacon's declaration due to his failure to disclose himself as a witness under FRCP 26(a). Bacon admitted at oral argument that he did not disclose himself as required. Under FRCP 37(c), his testimony must be struck.

[5] For the sake of clarity, plaintiff's date of termination — May 25, 2007 — fell on a Friday. Thus, the week of May 21 is the same week that plaintiff was terminated.

In sum, neither plaintiff nor his attorney spoke directly over the phone with supervisor Johnson or plant manager Greaves from the date the May 4 letter was mailed to the date of plaintiff's termination three weeks later. According to defendant, this failure by plaintiff to call Johnson or Greaves was the sole reason that plaintiff was terminated (*ibid.*).

**4.    THE FIRING OF FRANK RAYMONDE**

On May 25, 2007, plant manager Bill Greaves instructed supervisor Alan Johnson to send plaintiff a letter via Federal Express terminating his employment at the Pittsburg Power Plant (Greaves Decl. ¶ 9). The properly addressed termination letter, received by plaintiff that same day, stated that plaintiff was terminated because he "ha[d] not demonstrated a willingness to contact [operations supervisor Alan Johnson] to discuss [his] return to work" (Raymonde Decl. Exh.18; Greaves Decl. ¶ 9, Exh. 9).

Following his termination, plaintiff filed (1) a letter sent on June 13, 2007, to IBEW Local 1245 requesting a grievance hearing, and (2) an NLRB "Charge Against Employer" complaint filed on June 21, 2007 (Raymonde Decl. ¶¶ 5, 6; Exh. 1).

**5.    SUMMARY OF THE PARTIES' ALLEGATIONS**

According to plaintiff, the undisputed facts clearly show that he was prevented from returning to work on May 11, 2007, because (1) he lawfully reported a "near miss" safety incident to his superiors on February 5, 2007, and (2) he lawfully filed complaints with the NLRB and his union regarding the safety incident, his harassment by the union, and retaliatory conduct by his employer following the safety incident (Raymonde Dep. 123:1–4, 273:16–18, Exh. 21, NLRB Affidavit). Plaintiff further claims that these motivations, as well as the May 13 OSHA complaint he filed, formed the basis for his termination on May 25, 2007 (*ibid.*).

Defendant, by contrast, argues that the undisputed facts show that the deactivation of plaintiff's access card was in direct response to the altercation at the Pittsburg Power Plant on May 3, 2007, and plaintiff's subsequent termination was due to plaintiff's failure to personally call plant manager Bill Greaves or operations supervisor Alan Johnson (Greaves Decl. ¶¶ 3, 4, 9, 16–26; Battles Decl. ¶ 4).

*          *          *

Plaintiff filed this action in Contra Costa County Superior Court on May 20, 2008, alleging ten causes of action against defendant (Achtert Decl. Exh. A):

1. Violation of the California Fair Employment and Housing Act (FEHA) for age discrimination.

2. Violation of FEHA for discrimination based upon plaintiff's association with Eddie Williams, Jr. and Matthew Thompson, two African-American employees at Mirant's Pittsburg Power Plant.

3. Violation of Article I, Section 1 of the California Constitution.

4. Wrongful discharge in violation of California Labor Code Section 6310.

5. Breach of contract under the CBA governing plaintiff's employment with defendant.

6. Breach of the covenant of good faith and fair dealing.

7. Violation of California Labor Code Section 1102.5(b)–(d).

8. Intentional infliction of emotional distress.

9. Negligent infliction of emotional distress.

10. Violation of Public Policy under California law.

Defendant timely removed the action to federal court, asserting that subject-matter jurisdiction was proper under 28 U.S.C. 1331 and 1337 due to preemption of plaintiff's claims by Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. 185 (Achtert Decl. Exh. 2).

Following the close of discovery, defendant noticed and filed this motion for summary judgment. Plaintiff filed a timely opposition, wherein he stipulated to the dismissal of his first, second, fifth, sixth, and tenth claims for relief. These dismissed claims are addressed at the end of the analysis section. An unpleasant-looking, footnote-heavy reply brief was then submitted by defendant.[6] Spirited oral argument on this motion was heard before the undersigned on the morning of January 21, 2010.

---

[6] As an example, page three of defendant's reply brief contained only two lines of non-footnote text; the remainder of the page contained *47 lines* of single-spaced footnote text. Please avoid this in the future.

**ANALYSIS**

Since subject-matter jurisdiction over this action is predicated on the preemption of plaintiff's state-law claims under Section 301 of the LMRA, this principle is addressed first.

**1.      FEDERAL PREEMPTION UNDER SECTION 301 OF THE LMRA**

Section 301 of the LMRA preempts state-law claims "founded directly on rights created by collective-bargaining agreements," and "claims 'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987) (quoting *Electrical Workers v. Hechler*, 481 U.S. 851, 859 n.3 (1987)). When determining whether a state-law claim is preempted, "[t]he plaintiff's claim is the touchstone for th[e] analysis; the need to interpret the CBA must inhere in the nature of the plaintiff's claim." *Cramer v. Consolidated Freightways Inc.*, 255 F.3d 683, 691 (9th Cir. 2001) (en banc). As a result of this mandate, the "preemptive force of section 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization." *Burnside v. Kiewit Pacific Corp.,* 491 F.3d 1053, 1059 (9th Cir. 2007). Preemption, however, may extend beyond express breach of contract claims to *any* state-law claim that "is either grounded in the provisions of the labor contract or requires interpretation of it." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210 (1985).

There is no question, therefore, that plaintiff's claim alleging breach of contract — which, as pled in the complaint, targeted the terms of the CBA between IBEW Local 1245 and defendant — was preempted by Section 301 of the LMRA. *Burnside*, 491 F.3d at 1059. As such, defendant's asserted basis for removal was proper, and the Court has proper subject-matter jurisdiction to adjudicate this dispute.

**2.      LEGAL STANDARD FOR SUMMARY JUDGMENT**

It is well-settled that the party moving for summary judgment has the initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48 (1986); FRCP 56(c). Once the moving party has met this initial burden, the nonmoving party has the subsequent burden of presenting evidence to show that a genuine issue of fact remains. The party opposing the motion

1    for summary judgment "may not rest upon the mere allegations or denials" in its pleading, but

2    "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248.  If the

3    party opposing the motion fails to make a showing sufficient to meet this burden, then summary

4    judgment is proper.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

5         **3.    CLAIM 3: VIOLATION OF THE CALIFORNIA CONSTITUTION**

6         Plaintiff alleges that the termination of his employment "without any just cause" has

7    "prevented [him] from protecting his property right of employment with Mirant" as purportedly

8    guaranteed by Article I, Section 1, of the California Constitution (Compl. ¶¶ 53–54).  In response,

9    defendant asserts that because it is a privately owned and operated business, plaintiff has failed to

10   state a claim upon which relief can be granted (Br. 17).  Defendant is correct.  Mirant is a limited

11   liability corporation duly organized and existing under the laws of the State of California; its

12   termination of plaintiff's employment did *not* constitute state action in any legally cognizable

13   way.  As such, plaintiff's claim under the California Constitution must fail.  *See Skelly v. State*

14   *Personnel Bd.*, 15 Cal.3d 194, 206–7 (1975) (recognizing that employees in certain permanent

15   *civil service* positions had "a legally enforceable right to receive a government benefit"

16   constituting "a property interest" under the California Constitution); *Coleman v. Dep't of*

17   *Personnel Administration*, 52 Cal.3d 1102, 1112 (1991) ("Only those actions that may fairly be

18   attributed *to the state* . . . are subject to due process protections.").  Summary judgment as to this

19   claim is therefore **GRANTED**.

20        **4.    CLAIM 4: VIOLATION OF THE CALIFORNIA LABOR CODE SECTION 6310**

21        Plaintiff asserts that his harassment while employed at Mirant, the deactivation of his

22   security badge, and his eventual termination by defendant were based upon either (1) defendant's

23   fear that plaintiff had filed a complaint with OSHA for safety violations at the Pittsburg Power

24   Plant or (2) defendant's fear that plaintiff would lodge additional safety complaints while

25   employed at Mirant (Compl. ¶¶ 58–59).  Plaintiff alternatively alleges that defendant terminated

26   him after it learned (rather than feared) that plaintiff had actually filed a complaint with OSHA

27   (*id.* ¶ 62).

28

A violation of Section 6310 can serve as the basis for a claim of wrongful termination in violation of public policy. *Freund v. Nycomed Amersham*, 347 F.3d 752, 758 (9th Cir. 2003) (citations omitted). Section 6310 states in relevant part:

> (a) No person shall discharge or in any manner discriminate against any employee because the employee has done any of the following:
>
> (1) Made any oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his or her employer, or his or her representative.
>
> . . .
>
> (b) Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because the employee has made a bona fide oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his or her employer, or his or her representative, of unsafe working conditions, or work practices, in his or her employment or place of employment, or has participated in an employer-employee occupational health and safety committee, shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer.

The public policy behind Section 6310 is not merely to aid the reporting of actual safety and health violations; it is to prevent retaliation against those who in good faith report working conditions they believe to be unsafe. *Freund*, 347 F.3d at 759.

To prove a claim of retaliation under Section 6310, plaintiff must first establish a *prima facie* case of retaliation. To establish a *prima facie* case of retaliation, plaintiff must establish that (1) he engaged in a protected activity, (2) defendant subjected him to an adverse employment action, and (3) there is a causal link between the two. If plaintiff meets this burden, defendant must then provide a legitimate, non-retaliatory explanation for its actions. Finally, if defendant provides such an explanation, plaintiff carries the burden of showing that this explanation is merely a pretext for retaliation. *Patten v. Grant Joint Union High School Dist.*, 134 Cal.App.4th 1378, 1384 (2005); *Lloyd v. County of Los Angeles*, 172 Cal.App.4th 320, 332 (2009) (applying the same three-part test to retaliation claims under Section 6310 and 1102.5). To establish pretext, "very little" *direct* evidence of retaliatory motive is sufficient. If, however, only

14

1   *circumstantial* evidence is offered, such evidence has to be "specific" and "substantial." *Godwin*

2   *v. Hunt Wesson Inc.*, 150 F.3d 1217, 1222 (9th Cir.1998); *Little v. Windermere Relocation, Inc.*,

3   265 F.3d 903, 915 (9th Cir.2001).

4          To meet its initial burden at summary judgment, a defendant can either show that the

5   plaintiff has failed to allege sufficient evidence to establish a *prima facie* case, or it provide

6   evidence showing a legitimate, non-retaliatory reason for the adverse employment action.

7   *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1042 (2005). If this burden is met, plaintiff must

8   then provide sufficient evidence to give rise to a genuine issue of material fact as to whether the

9   employer's actual motive was *retaliatory*. Otherwise, summary judgment for the defendant is

10  appropriate. *L'Oreal*, 36 Cal.4th at 1042.

11         In targeting plaintiff's evidence supporting a *prima facie* case of retaliation, Mirant does

12  not dispute that reporting safety violations was protected or that deactivating plaintiff's security

13  badge and subsequently terminating plaintiff's employment were adverse employment actions

14  (Br. 17–18).[7] Rather, defendant focuses on whether plaintiff has sufficiently shown a causal link

15  between the two. On this issue, defendant argues that plaintiff has produced no evidence that Bill

16  Greaves, the decision-maker behind the adverse employment actions, was aware of or feared

17  plaintiff's OSHA complaint at the time he authorized the deactivation of plaintiff's security badge

18  and termination. Additionally, defendant argues that plaintiff's only evidence of a causal link is

19  the fact that his termination occurred after the filing of his OSHA complaint (Raymonde Dep.

20  173:13–174:12; 274:13–17).

21         "Causation sufficient to establish the third element of [plaintiff's] *prima facie* case may be

22  inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff

23  engaged in protected activities and the proximity in time between the protected action and the

24

25         [7] With respect to plaintiff's allegations of harassment in the workplace, plaintiff cannot make a *prima facie* case of retaliation for two reasons: *First*, plaintiff cannot show that defendant was responsible for the harassment. Plaintiff admits in his own depositions that the harassment came from union representatives or fellow employees, and not from Mirant management (Raymonde Dep. 108:15–109:2, 124:3–5, 223:17–23). *Second*, "[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable." *Yanowitz*, 36 Cal.4th at 1054–55. Plaintiff has not alleged or shown that the harassment did more than merely anger or upset him.

26

27

28

1   allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th

2   Cir.1987). While decision-maker Greaves may or may not have known that plaintiff filed an

3   OSHA complaint on May 13, 2007, he was certainly aware of the "near miss" safety incident

4   reported by plaintiff on February 5, 2007 (Greaves Decl ¶¶ 16–19, 24). This knowledge,

5   combined with the relatively short three to four month period between the "near miss" report and

6   the adverse employment actions, is sufficient to make a *prima facie* case. *Yartzoff*, 809 F.2d at

7   1376; *Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, 166 Cal.App.4th 952, 990 (2008)

8   (concluding that a six-month period between a protected activity and an adverse employment

9   action was sufficient temporal proximity to make a *prima facie* case of retaliation).

10      A *prima facie* case having been shown, defendant now bears the burden of setting forth a

11  *legitimate*, non-retaliatory reason for both of its adverse employment actions. With respect to the

12  deactivation of plaintiff's security badge, the evidence put forth by defendant — corroborated by

13  multiple witnesses and plaintiff's own deposition testimony and sworn affidavits — demonstrates

14  that the May 3 altercation between plaintiff and Mirant employee John Nelson provided a

15  legitimate, non-retaliatory basis for defendant's actions. It is undisputed that plaintiff acted

16  aggressively (or, in plaintiff's *own words*, "forcefully") towards co-worker John Nelson on that

17  date. Additionally, defendant produced ample documentation regarding the May 3 altercation,

18  including reports submitted by Mirant employees to decision-maker Greaves that discussed

19  plaintiff's history of aggressive behavior at the Pittsburg Power Plant. Based upon this

20  information, defendant decided that plaintiff was a danger to his coworkers, and his security

21  badge should be temporarily disabled.[8]

22      With respect to plaintiff's termination on May 25, 2007, defendant rests on a single non-

23  retaliatory justification: plaintiff was terminated because he failed to *personally* call Alan

24

25

26      [8] Plaintiff disputes whether he in fact had a history of aggressive behavior at Mirant. This, however, is
    immaterial to the question of whether Bill Greaves acted with retaliatory intent. Put another way, even if
27  Greaves relied upon completely inaccurate reports describing plaintiff's history of aggressiveness, this would
    not affect whether his decision was made for legitimate, non-retaliatory reasons. So long as Greaves reasonably
28  believed the reports submitted by Mirant employees, his actions in reliance on those reports were non-
    retaliatory. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir.2002).

16

1  Johnson as he had been allegedly instructed to do in the May 10 pre-termination letter and by

2  human resources manager Lisa Battles during their phone conversation on May 17, 2007.

3  Adding further support to defendant's non-retaliatory explanations, Greaves asserted

4  under oath that he did not know or fear that plaintiff had filed a complaint to OSHA when taking

5  any of these actions (Greaves Decl. ¶¶ 16–23).  All Greaves knew regarding plaintiff's past

6  protected activities was his involvement in the "near miss" report filed on February 5, 2007 (*id.* ¶

7  24).  As to the February 5 safety incident, Greaves asserts that it played no role in either of the

8  adverse employment actions (*id.* ¶ 25–26).

9  On this record, defendant has met its burden in putting forth a legitimate, non-retaliatory

10  reason as to why it deactivated plaintiff's security badge on May 11, 2007.  With respect to

11  plaintiff's termination on May 25, 2007, this order will assume, for reasons that will soon become

12  clear, that defendant has met its burden.

13  Once an employer produces "legitimate reason[s] for the adverse employment action[s],

14  the presumption of retaliation drops out of the picture, and the burden shifts back to the employee

15  to prove intentional retaliation." *Yanowitz*, 36 Cal.4th at 1042 (internal quotations omitted).

16  Plaintiff, therefore, must prove by competent evidence that defendant's proffered justification is

17  mere pretext.  In other words, plaintiff must show that the "presumptively valid reasons for the

18  employer's actions were in fact a coverup," and "demonstrate such weaknesses, implausibilities,

19  inconsistencies, incoherencies, or contradictions in the proffered legitimate reasons that a

20  reasonable fact[-]finder could conclude that the stated reasons are not credible, and that the

21  employer's true motive was retaliatory." *McRae v. Dep't of Corrections & Rehabilitation*, 142

22  Cal.App.4th 377, 388–89 (2006) (internal quotations omitted).

23  On this point, defendant argues that plaintiff's sole evidence of retaliatory motive is the

24  temporal proximity between the protected actions and allegedly retaliatory conduct, and that this

25  is insufficient to meet plaintiff's burden of proving pretext.  While this is a correct statement of

26  the law, defendant ignores various items of circumstantial evidence presented by plaintiff.

27  *Loggins v. Kaiser Permanente Int'l*, 151 Cal.App.4th 1102, 1112–1113 (2007).

28

*First*, plaintiff claims in his deposition that he informed Cathy Brennan — Mirant's human resources director in their Atlanta offices — that he had filed a complaint with OSHA during their brief conversation on May 17, 2007. Based upon this fact, plaintiff asserts that this information somehow found its way to plant manager Bill Greaves before he took action against plaintiff (Raymonde Dep. 271:17–272:14–16). Plaintiff, however, produces no evidence whatsoever that Greaves knew of the OSHA complaint, admitting that it is simply "guess and speculation" that Greaves knew or feared that he would file such a complaint (*id.* 272:14–16).[9]

*Second*, plaintiff argues that defendant *intentionally* mailed the May 4 and May 10 pre-termination letters to his incorrect address, thereby supporting a finding of pretext and discriminatory intent. In other words, plaintiff asserts that defendant was never serious about contacting him regarding his return to work. On this point, plaintiff points to specific and substantial evidence showing that defendant did have his correct address on file at the time the two pre-termination letters were mailed to him. Defendant nevertheless disputes that it had plaintiff's correct address on file.

*Third*, plaintiff disputes that he failed to comply with the instructions by defendant to contact supervisor Alan Johnson or plant manager Bill Greaves. At oral argument, Attorney Bacon aptly pointed out that plaintiff *never* received the May 4 letter prior to his termination, and that the May 10 letter was not received by plaintiff until May 17, the day that the letter set as the deadline for plaintiff to call supervisor Johnson (else, as the letter stated, he would be deemed "resigned"). On that day, plaintiff contacted Mirant's human resources department by phone to inquire about the letter. Decision-maker Greaves knew that plaintiff had made this phone call the same day it was made (Greaves Decl. ¶ 7). Additionally, plaintiff contends that he *did* attempt to call Johnson directly, albeit with his attorney present, on May 18, 2007 (Raymonde Decl. ¶ 50). After leaving a voice mail message, plaintiff's attorney then faxed a letter to Johnson, explaining that plaintiff had received the May 10 letter, had not resigned, and intended to return to work

---

[9] A related argument made by plaintiff is that defendant took adverse action against him because his complaint filed with OSHA would affect defendant's bonus payments. This assertion, however, is unsupported by any competent evidence in the record. There is no evidence establishing that the February 5 "near miss" report, or plaintiff's OSHA complaint addressing that incident, would have affected bonus payments in any way.

(*ibid.*; Battles Decl. ¶ 10). The letter expressly asked Johnson to call plaintiff's attorney to discuss when plaintiff would be permitted to return to work (Battles Decl. ¶ 10). Decision-maker Greaves admits receiving and reviewing a copy of this letter on May 18, one week prior to terminating plaintiff on the grounds that he "ha[d] not demonstrated a willingness to contact [Alan Johnson] to discuss [his] return to work" (Raymonde Decl. Exh.18; Greaves Decl. ¶ 8). Based upon these facts, plaintiff argues that defendant's explanation for firing him is false and pretextual.

Having considered the full scope of circumstantial evidence presented by plaintiff, the undersigned finds that there is a genuine issue for trial as to whether defendant's proffered reason for terminating plaintiff was pretextual. Due to the unexplained use of an incorrect mailing address by defendant, plaintiff did not learn of any "instructions" to call supervisor Johnson until the *very day* the letter designated as the deadline for plaintiff to contact Johnson. Nevertheless, plaintiff did not hesitate to call defendant on May 17. The fact that plaintiff called defendant's corporate offices in Atlanta rather than Johnson himself does not seem like reasonable grounds for termination, especially given plaintiff's sworn assertion that he attempted to contact Johnson the next day. By May 18, plaintiff's decision to seek the assistance of an attorney was reasonable. Finally, it is undisputed that Mirant *knew* before terminating plaintiff that he did not consider himself "resigned" and was seeking instructions on returning to his job — decision-maker Greaves now admits as much in his declaration (*ibid.*). Nevertheless, defendant terminated plaintiff one week later, for what a jury could find was so hyper-technical a reason that it was likely pretextual.

Defendant, in its motion and at oral argument, argued that while its reason for terminating plaintiff might have been harsh or even mistaken, this does not prove that defendant's conduct was motivated by retaliation. As such, defendant claims that it doesn't matter whether plaintiff's termination was unreasonable — all that matters is whether it was motivated by retaliatory intent. While this is a correct statement of the law when there is no genuine issue as to the veracity of defendant's proffered reasons for its actions, defendant completely ignores the possibility that a fact-finder may find its proffered reason so "unworthy of credence" as to be evidence of pretext.

1  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir.2008) (internal quotation marks and

2  citations omitted). Here, plaintiff has met its burden in producing sufficient circumstantial

3  evidence to survive summary judgment on this claim.

4       A few additional comments, however, are required as to the two adverse employment

5  actions at issue in this claim. While the material circumstances of plaintiff's termination are

6  clearly in dispute, the facts underlying the deactivation of plaintiff's security badge are not as

7  unsettled. Indeed, the undisputed facts show that the deactivation of plaintiff's security badge

8  occurred *prior to* the filing of plaintiff's OSHA complaint, and therefore it cannot have been

9  motivated by retaliatory intent due to that filing. Additionally, plaintiff has not put forth any

10  competent evidence that the February 5 safety incident motivated, in any way, the decision by

11  defendant to deactivate his security badge. That said, granting partial summary judgment as to

12  the deactivation of plaintiff's security badge (but leaving the act of termination for the jury)

13  would create needless complications at trial. Indeed, under any scenario, the jury would need to

14  be informed of the circumstances leading up to plaintiff's termination, including the deactivation

15  of his security badge. As such, the undersigned sees no good reason to subtract the "lock out"

16  issue from the trial, although it may wind up being subtracted from the jury room under Rule 50.

17  Summary judgment as to this claim is therefore **DENIED**.

18       **5.**      **CLAIM 7: VIOLATION OF CALIFORNIA LABOR CODE SECTION 1102.5**

19  California Labor Code Section 1102.5 states, in relevant part:

20       (b) An employer may not retaliate against an employee for
   disclosing information to a government or law enforcement

21       agency, where the employee has reasonable cause to believe that
   the information discloses a violation of state or federal statute, or a

22       violation or noncompliance with a state or federal rule or
   regulation.

23

24       (c) An employer may not retaliate against an employee for refusing
   to participate in an activity that would result in a violation of state

25       or federal statute, or a violation or noncompliance with a state or
   federal rule or regulation.

26       (d) An employer may not retaliate against an employee for having
   exercised his or her rights under subdivision (a), (b), or (c) in any

27       former employment.

28

As alleged in his complaint, plaintiff's Section 1102.5 claim is tethered solely to defendant's alleged retaliatory conduct relating to the filing (or threatened filing) of plaintiff's OSHA complaint, perfectly mirroring the previous claim (Compl. ¶¶ 73–74).

Indeed, the same exact test applies to retaliation claims brought under both Section 1102.5 and Section 6310. *See Patten v. Grant Joint Union High School Dist.*, 34 Cal.App.4th 1378, 1384 (2005). Given that both retaliation claims are premised on exactly the same protected conduct — namely, plaintiff's lawful reporting of safety violations — and the same exact alleged facts, the analysis and conclusions of the previous section applies with equal force to this claim. As such, summary judgment on this claim must also be **DENIED**.

### 6. CLAIM 8: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

A *prima facie* case for intentional infliction of emotional distress requires proof of three elements: (1) extreme and outrageous conduct by the defendant with the intent to cause, or reckless disregard for the probability of causing, emotional distress; (2) suffering of "severe" or "extreme" emotional distress by plaintiff; and (3) plaintiff's emotional distress is actually and proximately the result of defendant's outrageous conduct. *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009). To be considered outrageous, a defendant's conduct must be so extreme as to exceed all bounds tolerated in a civilized community. *Id.* at 1050–51. With respect to the requirement that the plaintiff show severe emotional distress, this means "emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 956, 1004 (1993).

This claim fails on multiple fronts. First and foremost, plaintiff has not produced *any* evidence that defendant acted in a manner "so extreme as to exceed all bounds tolerated in a civilized community." Instead, the undisputed facts show that *plaintiff* forcefully and aggressively confronted a coworker, calling him a "prissy cunt." Defendent then responded to this act by temporarily deactivating plaintiff's security badge, based upon a reasonable concern that plaintiff was a danger to other employees. This is not conduct that is "so extreme as to exceed all bounds tolerated in a civilized community." Rather, it is supervisory conduct one would expect from an employer. Furthermore, while defendant's assertion that plaintiff failed to

1    *personally* call supervisor Johnson is admittedly harsh, this does not amount to conduct

2    "exceed[ing] all bounds tolerated in a civilized community."  *See Janken v. GM Hughes*

3    *Electronics*, 46 Cal.App.4th 55, 80 (1996) (noting that "managing personnel is not outrageous

4    conduct beyond the bounds of human decency, but rather conduct essential to the welfare and

5    prosperity of society").  Morever, plaintiff has not shown that he has suffered any emotional

6    distress of such substantial or enduring quality that "no reasonable person in civilized society

7    should be expected to endure it."  By contrast, plaintiff admits in his deposition that he "ha[d]

8    seen no doctors of any kind," and saw no therapists or counselors between the date his security

9    badge was deactivated to the date of the deposition (Raymonde Dep. 275:10–23).  While evidence

10   of medical care is not required to prove severe emotional distress, its absence is often cited as

11   grounds for rejecting such a claim.  *See, e.g.*, *Girard v. Ball*, 125 Cal.App.3d 772, 788 (1981)

12   (rejecting an intentional infliction of emotional distress claim because plaintiff "sought no

13   medical treatment for his condition" and complained only of anxiety, insomnia, and nervousness).

14   Here, plaintiff has put forth no competent evidence that he suffered severe emotional distress due

15   to defendant's actions.

16          Defendant's motion for summary judgment on this claim must therefore be **GRANTED**.

17   **7.      CLAIM 9: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

18          The analysis of a claim for negligent infliction of emotional distress follows the traditional

19   elements of negligence, in which duty to the plaintiff is an essential element.  *Potter*, 6 Cal.4th at

20   984.  As such, recovery for emotional distress is available only if plaintiff can show that

21   defendant owned him a duty and breached that duty, thereby proximately causing the alleged

22   emotional distress.  In this action, plaintiff has failed to establish any of these elements with

23   competent evidence.  Indeed, all plaintiff does in his opposition is recite the above-mentioned

24   elements of an NIED claim (Opp. 14).  This is plainly insufficient to survive summary judgment.

25   Independent of this defect, numerous California courts have held that "[a]n employer's

26   supervisory conduct is inherently intentional," and therefore such conduct cannot support an

27   action for negligence.  *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal.3d 148, 160 (1987).  This

28

1    provides a separate, but equally compelling ground, for summary judgment on this claim to be

2    **GRANTED**.

3        **8.    PLAINTIFF'S DISMISSED CLAIMS**

4        In his opposition, plaintiff "stipulate[d] to the dismissal" of his first, second, fifth, sixth,

5    and tenth claims for relief (Opp. 1).  This stipulation, however, was *not* signed by both parties

6    pursuant to FRCP 41(a).  Nevertheless, the undersigned will treat these five claims as abandoned

7    by plaintiff.  As such, plaintiff's first, second, fifth, sixth, and tenth claims are hereby **DISMISSED**

8    **WITH PREJUDICE**.

9                            **CONCLUSION**

10       For the reasons set forth above, defendant's motion for summary judgment is **GRANTED**

11   with respect to claims three, eight, and nine, and **DENIED** with respect to claims four and seven.

12   Since plaintiff abandoned his first, second, fifth, sixth, and tenth claims, these claims are hereby

13   **DISMISSED WITH PREJUDICE**.

14       A final caveat must be added.  After denying a defense summary judgment motion, the

15   undersigned has occasionally found that the trial record falls short of the summary judgment

16   record and a Rule 50 motion is warranted.  Sometimes the plaintiff refuses to go as far at trial as

17   he or she did in a lawyer-prepared declaration.  Sometimes evidentiary objections make a

18   difference.  Where, as here, the overall case is borderline, and defendants have raised a plethora

19   of evidentiary objections, the potential for such an outcome is heightened.  As such, counsel

20   should not take anything for granted and both sides should be mindful of Rule 50.

21

22       **IT IS SO ORDERED.**

23

24   Dated:  January 25, 2010.

25                            WILLIAM ALSUP
                             UNITED STATES DISTRICT JUDGE

26

27

28